J-A03012-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF ANDREW F. RODGERS AN INCAPACITATED PERSON | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: SUSAN R. WEHAR | : | No. 898 WDA 2018 |

Appeal from the Order Entered May 22, 2018
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): No. 7404 of 2017

BEFORE:  BOWES, J., SHOGAN, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.:                    **FILED APRIL 22, 2019**

Susan R. Wehar appeals from the order that appointed a limited guardian of the person and estate of her father, Andrew F. Rodgers.  We remand with instructions.

Mr. Rodgers was born in 1930 and had been married to the mother of Ms. Wehar until she passed away approximately twenty-five years ago.  For the past twenty years, Mr. Rodgers has been married to his second wife, Patricia Rodgers.  Ms. Wehar and Mrs. Rodgers are not fond of each other.

Ms. Wehar possessed a financial power of attorney ("POA") for her father since 2000.  In late 2017, Mr. Rodgers suffered a series of strokes, prompting Ms. Wehar to file a petition for the appointment of a guardian, seeking to have herself appointed as the plenary guardian of Mr. Rodgers' person and a trust company appointed plenary guardian of his estate.  Mr. Rodgers filed a responsive pleading alternatively contending that the petition contained insufficient allegations of his incapacity, that his relationship with Mrs. Rodgers

_____
*  Retired Senior Judge assigned to the Superior Court.

was sufficient social support, that a power of attorney was an appropriate alternative, and that, if he is partially incapacitated, a limited guardianship is preferred. In a counterclaim, Mr. Rodgers nominated Mrs. Rodgers to serve if the court should determine that a guardian was needed. In the interim, Mr. Rodgers revoked all prior POAs, gave a new POA to Mrs. Rodgers, and nominated Mrs. Rodgers to be his guardian if a guardian became necessary.

The orphans' court held a guardianship hearing on May 2, 2018, at which Ms. Wehar, Mr. and Mrs. Rodgers, and others testified. Ms. Wehar attempted to introduce evidence that Mrs. Rodgers had a conflict of interest, but much of it was excluded by the orphans' court. Rather, the court directed Ms. Wehar to focus on the issue of Mr. Rodgers's alleged incapacity.[1] At the conclusion of the hearing, Ms. Wehar argued that a limited guardianship was appropriate, and that a neutral professional be appointed because Mrs. Rodgers had a conflict of interest. Specifically, she pointed to the fact that Mrs. Rodgers attempted to have Mr. Rodgers's attorney convey $1 million to her shortly after his first stroke, a move that would upset the long-established estate plan and prenuptial agreement. Mr. Rodgers contended that he had sufficiently recovered from his strokes such that no guardian was necessary, but that, if one was to be appointed, it should be Mrs. Rodgers.

_____

[1] The court also repeatedly expressed its concern about the length of time the proceeding was taking.

- 2 -

The orphans' court agreed with Ms. Wehar that Mr. Rodgers was partially incapacitated, but elected to appoint Mrs. Rodgers as the limited guardian. The court entered an order on May 22, 2018, effectuating its decision, giving Mrs. Rodgers only the power to receive income and pay bills. The limited guardianship did not allow for change in ownership of any of Mr. Rodgers's assets without further order of court, and requires the filing of an inventory semi-annually with Mr. Rodgers's long-time attorney.

Ms. Wehar filed a timely notice of appeal from that order, and both she and the orphans' court complied with Pa.R.A.P. 1925. Ms. Wehar presents the following questions for our review.

1. Is there a conflict of interest between an incapacitated person and a proposed guardian of the estate, where the proposed guardian tried to enrich herself at the expense of the incapacitated person by:

   (a) transferring $1 million from the incapacitated person to herself;

   (b) doubling the amount of money she received from a trust created by the incapacitated person;

   (c) selling real property owned by the incapacitated person; and

   (d) invalidating her prenuptial agreement with the incapacitated person?

2. Did the [orphans'] court abuse its discretion by excluding as evidence of a proposed guardian of the estate's conflict of interest:

   (a) a proposed Amendment to the Second Amended and Restated Revocable Agreement of Trust that would

have doubled the amount Ms. Rodgers received under the trust;

(b)     Ms. Rodgers'[s] attempt to invalidate her prenuptial agreement; and

(c)     Ms. Rodgers'[s] filing of support proceedings against [Mr. Rodgers] in the divorce action she filed?

3.      Did the [orphans'] court abuse its discretion by excluding testimony from the attorneys who drafted the amendment to the trust created by the incapacitated person where the testimony sought would merely have confirmed the preparation of the documents and did not implicate the attorney-client privilege?

Ms. Wehar's brief at 6-7.

We begin with a review of the applicable law.

The appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion. Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will.

*In re Duran*, 769 A.2d 497, 506 (Pa.Super. 2001) (cleaned up).

Our legislature has provided that, upon clear and convincing evidence of incapacity, an orphans' court may appoint a guardian of the person and/or estate.[2]    **See** 20 Pa.C.S. § 5511(a). The statute offers the following qualifications regarding who may be appointed to be a guardian.

---

[2] As mentioned above, the orphans' court determined that Mr. Rodgers was partially incapacitated, and neither Ms. Wehar nor Mr. Rodgers disputes in this Court the propriety of that finding.

- 4 -

> The court may appoint as guardian any qualified individual, a corporate fiduciary, a nonprofit corporation, a guardianship support agency . . . or a county agency. In the case of residents of State facilities, the court may also appoint, only as guardian of the estate, the guardian office at the appropriate State facility. **The court shall not appoint a** . . . **person whose interests conflict with those of the incapacitated person except where it is clearly demonstrated that no guardianship support agency or other alternative exists**. Any family relationship to such individual shall not, by itself, be considered as an interest adverse to the alleged incapacitated person. If appropriate, the court shall give preference to a nominee of the incapacitated person.

20 Pa.C.S. § 5511(f) (emphasis added). As there is no presumption that a family relationship alone constitutes a conflict of interest, the burden is upon one challenging an appointment to prove the existence of an adverse interest. *In re Heidtman's Estate*, 306 A.2d 878, 879 (Pa. 1973).

Our Supreme Court found that no conflict was shown in *Heidtman's Estate*. In that case, the siblings of an incapacitated person challenged the appointment of her husband as guardian by offering extracts of her journal regarding business transactions. Specifically, there were various notations made suggesting that stocks owned by the incapacitated wife were incorrectly in the husband's name, that the wife owed money to the husband for a purchase made on her behalf, and that he sold her stocks but she did not know what he bought with the proceeds. *Id*. at 880 n.4. The Court held that those notations did not *per se* establish negligence or misconduct, or alone support mismanagement or overreaching by the husband. Thus, there was

"insufficient evidence of adverse interest to justify a finding of an abuse of discretion by the" orphans' court. *Id*. at 880.

Similarly, in the decision of the common pleas court in *In re Forsyth Estate*, 12 Pa. D.&C. 3d 368 (Fayette County 1979), the orphans' court found that the incapacitated person's wife could properly serve as guardian where no evidence was offered "of misappropriation or misuse of any of the assets of [the incapacitated person] by his wife." *Id*. at 369.

This Court held that the orphans' court abused its discretion in appointing a conflicted person as guardian in *Wilhelm v. Wilhelm*, 657 A.2d 34 (Pa.Super. 1995). In that case, husband and wife experienced marital difficulties in the 1970s and 80s, and wife had filed for divorce. *Id*. at 36. Husband executed a will during this time leaving all of his money to the couple's four children, and deposited a substantial sum in joint bank accounts he had created with the children individually. *Id*. Husband and wife reunited after a separation of more than ten years, and, when husband developed health problems, he gave wife a POA, which she attempted to use to withdraw the funds from the joint accounts with the children. Husband and wife initiated an action seeking possession of the funds, claiming that the accounts had been created for husband's convenience and that he owned all of the money and interest generated therefrom. *Id*. The children contended that the accounts had not been convenience accounts, but rather, husband made the

children co-owners with a right of survivorship. The children also claimed that husband became incapacitated shortly after creating the accounts. *Id*.

The orphans' court held that husband was generally incapable of handling his affairs, and found in favor of the children, designating one of them "to act on behalf of all said joint tenants to determine, from time to time, whether any of said funds are needed for the maintenance and care of" husband. *Id*. at 37 (internal quotation marks omitted). On appeal, this Court reversed and remanded, concluding, *inter alia*, that under § 5511(f), the children could not serve as guardians based upon impermissible conflicts of interest. The Court explained as follows:

> It is readily apparent from the nature of the action before us that [the] siblings each have an interest which conflicts with that of their father. They each stand to benefit by the amounts of money remaining in the account at the death of their father. It was entirely inappropriate for the court to name any of [husband's] children as the person responsible for determining how and when his funds may be spent. While the statute does provide that a family relationship "shall not, by itself, be considered as an interest adverse to the alleged incapacitated person," we have far more in the instant case. The record is replete with evidence that the children and their parents have nothing but a hostile relationship. While this may have initially been directed against their mother, the children each have indicated that they have not spoken or cared for either parent for an extended period of time. More importantly, the children had a direct financial interest in the amounts of money expended on their father's care and therefore the amounts remaining in the joint accounts. We conclude that it is necessary for the court to reconsider this ruling and name a disinterested party as guardian . . . .

**Wilhelm**, **supra** at 39 (citation omitted).

In **Commonwealth, Department of Public Welfare v. Bean**, 558 A.2d 170 (Pa.Cmwlth. 1989), our sister court also held that children had conflicts of interest that precluded them from acting as guardians for their mother. In that case, the co-guardian children sought to sell a property co-owned by their parents. With the father in a nursing home and the mother confined to a state hospital due to mental illness, neither parent would be eligible for public assistance so long as they owned the non-resident property. *Id*. at 172. The children jointly obtained a POA from their father, initiated incompetency proceedings for their mother, and became her co-guardians. Their father also executed a will purporting to leave his share of the property to the children. The children then used their newly-gained authority to execute a deed transferring the property from a tenancy by the entireties to a tenancy in common. *Id*. After the father died, the children entered into an agreement to sell the property. The Department of Public Welfare ("DPW") objected, and challenged the deed that had made the property a tenancy in common. The orphans' court declined to strike the deed, determining that the children had no conflicts of interest and that the mother's best interests had been served by the transfer.

On appeal, the Commonwealth Court disagreed, holding that the evidence "overwhelmingly" supported a finding of conflicts of interest. The Court highlighted that the attorney who drafted the father's will testified that one of the children went with counsel when the father discussed his

testamentary arrangements and indicated his desire to leave his interest in the property to the children. *Id*. at 173. Further, each of the children received a bill from counsel for the cost of preparing and executing the father's will. Thus, at least one of the children/guardians for the mother "had knowledge sufficient to create a personal interest in executing the deed at issue which was of such substantial nature as **might** affect her judgment in a material way." *Id*. (emphasis in original). Although the actions were taken without an intent to defraud their mother, but rather to prevent their parents' entire estates from being depleted by the cost of their medical care, that concern related to the family's interests, not those of the mother. *Id*.

The common pleas court sitting *en banc* concluded that a wife had a disqualifying conflict of interest in **Estate of Lewis**, 2001 WL 34148893 (Phila. County 2001). In that case, a wife sought a declaration that her husband was incapacitated and her own appointment as his guardian. The attorney appointed to represent the husband in the proceeding opposed the wife's appointment, arguing that she had interests adverse to her husband. The attorney "suggested" that the wife had caused confusion regarding the husband's assets by comingling his different incomes; that she had engaged in self-dealing in attempting to transfer the husband's real property to her relatives; and that she had received substantial amounts of money from her husband as his POA. *Id*. at *1. The orphans' court concluded that the husband was partially incapacitated. Citing the rivalry between wife and the

husband's children from his first marriage, the court refused to consider any family member as guardian, and instead appointed a neutral third party. Upon *en banc* review of wife's exceptions, the court found no abuse of discretion,[3] concluding that "[t]he record clearly shows that the excepting spouse does have interests which are adverse to her husband." *Id*. at *3.

With the above being the only Pennsylvania cases addressing what evidence beyond the existence of a family relationship rises to the level of a disqualifying conflict, there is a dearth of authority on point. Accordingly, we examine decisions of our sister states for discussion of the issue. While we recognize that the specific provisions of the statutes of the various jurisdictions vary from each other and from the Pennsylvania statute at issue, the courts' considerations of what gives rise to a conflict of interest are instructive to our analysis.

Our review of the case law revealed that the results are fact-specific and dependent upon the record created in the lower court. For example, in **Falvey v. Zurilo**, 22 A.3d 682 (Conn. App. 2011), the court affirmed the finding of a conflict of interest in a daughter who previously wrote and received checks from her mother's bank account which were not reflected as gifts on income tax returns despite her claim that her mother gifted the money, and where

---

[3] As the court noted, when disposing of exceptions *en banc*, the court of common pleas performs "'essentially an appellate function'" and applies the appellate standard of review. **Estate of Lewis**, 2001 WL 34148893, *2 (Phila. County 2001) (quoting **In Re Duncan Trust**, 391 A.2d 1051 (Pa. 1978)).

she had an acrimonious relationship with her sister that affected the mother's well-being. However, in *In re Money*, 2012 WL 4480689, *3 (Ohio App. 2012), the court affirmed the appointment of a son as guardian, although he had continued to ask his mother for substantial sums of money after he was aware that she suffered from a diminished capacity. Despite this "cloud over [his] suitability as a guardian," the record supported the trial court's findings that the mother had provided for the son for years and the continuation of the support was in accordance with her desires.

Many courts have held that prior self-dealing, or attempts to do so, disqualified members from being guardians. ***See***, ***e.g.***, ***Cruver v. Mitchell***, 656 S.E.2d 269 (Ga. App. 2008) (holding conflict between children and mother existed where children removed her from a Medicaid program and planned to sell her property to pay for her care so government would not take possession of the property to recover expenses); ***In re Moses***, 615 S.E.2d 573 (Ga. App. 2005) (affirming appointment of third-party guardian where there was a dispute as to the authenticity of deeds purportedly executed by mother giving property to her children and there was testimony that mother feared and did not trust her children); ***Conservatorship of Anderson v. Lasen***, 628 N.W.2d 233 (Neb. 2001) (agreeing with lower court that holders of POA were disqualified from being guardians where they made gifts to themselves using POA and might ultimately be accountable to the estate for unauthorized transfers); ***Davis v. King***, 686 So.2d 763 (Fla. Dist. Ct. App. 1997) (holding

statutory presumption that person designated as guardian by the incapacitated person should be appointed was overcome by evidence that the designee had used a POA to obtain funds for her own benefit); **Matter of Waldron**, 910 S.W.2d 837 (Mo. Ct. App. 1995) (affirming appointment of independent guardian rather than two sons designated by mother where one son owed money to trust set up for mother's case and had been disbarred based in part on his handling of clients' funds, and the other was trustee of trust for mother's benefit and might have to decide whether to use that trust or another asset to cover mother's expenses); **Matter of Kern**, 627 N.Y.S.2d 257 (N.Y. Sup. Ct. 1995) (finding it would be inappropriate to burden POA/beneficiary with guardianship and "specter of future criticism" where she transferred funds to herself using POA, even though she may have done so with knowledge and consent of incapacitated person).

However, where the record revealed only the potential for a conflict, or past adverse interests that had been resolved, a number of courts declined to find a disqualifying conflict. **See**, **e.g.**, **Kuelbs v. Hill**, 379 S.W.3d 716 (Ark. App. 2010 (finding no abuse of discretion to appoint sister, although sister had sued ward for abuse of process and fraud, where lawsuit had been dismissed); **Adcock v. Sherling**, 923 S.W.2d 74 (Tex. App. 1996) (naming son as guardian, although trial court appointed grandson, where record did not establish how son's position as trustee would conflict with his role as guardian or that son was asserting claim adverse to the estate); **Franzetti v.**

*Kehrsberger*, 524 N.Y.S.2d 269 (N.Y. App. Div. 1988) (holding trial court did not abuse discretion in appointing trustee/contingent remainderman of trust as conservator, despite potential conflict of interest, where "court adequately safeguarded against any possible abuse of the fiduciary relationship by appointing co-conservator and by imposing reporting requirements"); *Kelley v. Kelley*, 199 S.E.2d 399 (Ga. App. 1973) (ruling that mere possibility of conflict did not automatically prelude service as guardian where guardian was estopped to seek to establish adverse interest in property and no such attempt had been made); *Arent v. Arent*, 32 N.W.2d 660 (Iowa 1948) (concluding estranged wife's separation from husband and holding of mortgage on his property was not a conflicting financial interest "of such a nature as to cause us to hold that it was an abuse of discretion on the part of the trial court to" appoint wife as husband's guardian).

We have also identified several cases in which courts have held that the trial court committed an abuse of discretion by making an appointment upon insufficient evidence of whether a conflict in fact existed. For example, in *In re Penning*, 930 A.2d 144 (D.C. 2007), Penning suffered from Alzheimer's disease and was hospitalized in Spain, where she was domiciled *Id*. at 146. Her brother filed petitions for the appointment of a guardian and conservator in Spain and in Washington, DC, where Penning owned property. While the petitions were pending, Penning married her longtime companion in England. *Id*. at 146-47. Penning, who had a hostile relationship with her brother and

- 13 -

had accused him of trying to gain control of her assets for his own benefit, denied the necessity of a guardian, but indicated that if one was required, she wanted her husband to be appointed. *Id*. at 147. Penning also executed a POA designating her husband as her attorney in fact.

The Washington, D.C. court appointed a third-party temporary conservator. The Spanish court found Penning to be incapacitated but concluded that her husband could not serve as her "tutor" because he had a conflict of interest. *Id*. However, the Spanish appellate court held that the latter finding was erroneous, as there was no evidence that the husband had financial interests adverse to Penning. *Id*. at 150. Back in Washington, the court, after a hearing, made the third-party's appointment as Penning's conservator permanent, concluding that the husband's conduct and actions were "suspicious and indicative of at least an apparent conflict of interest." *Id*. at 151.

The husband appealed, and the appellate court vacated the appointment of the third-party conservator. The court concluded that the lower "court's decision to override Penning's expressed wish to be cared for by her husband and [the husband's] statutory priority to serve as conservator was flawed because it was based on unproven accusations and suspicions rather than on actual findings of impropriety or conflict of interest." *Id*. at 153. Remand for development of an evidentiary foundation for the decision was ordered,

because the lower court "did not make an adequately informed decision and thus did not exercise its discretion properly[.]" *Id*. at 154.

In *In re Estate of Edwards*, 794 P.2d 1092 (Colo. App. 1990), Howard alleged that he was entitled to funds from Edwards's estate. He filed a petition seeking to have Edwards found to be incapacitated and a guardian appointed. Howard claimed that Edwards's now-deceased POA had wrongfully deprived Edwards of a significant sum of money, and the bank currently managing Edwards's affairs refused to assert a claim to get the funds back. The trial court denied the requested relief without a hearing. Without addressing the merits of Howard's petition, the appellate court concluded that the trial court abused its discretion in resolving the petition without taking evidence, explaining as follows:

> the existence of Howard's claims against the Edwards estate does not, *per se*, and as a matter of law, preclude Howard from being a person interested in the welfare of Edwards. Rather, the existence of any disqualifying conflict, based upon the assertion of adverse claims, presents issues of fact that must be initially determined by the trial court after it conducts an evidentiary hearing as to the nature and extent of the adversity involved.

*Id*. at 1094 (citations omitted). Therefore, the court remanded the case for a hearing.

The appellate court also found that the trial court abused its discretion in failing to take evidence in *In re Chase*, 694 N.Y.S.2d 363 (N.Y. App. Div. 1999). In that case, the father suffered a stroke that left him unable to communicate and from which he did not make significant recovery. His

daughter petitioned to be appointed as his guardian. The trial court instead appointed a third party, relying upon the conclusions of a court evaluator that the daughter had a financial interest adverse to her father's. The court evaluator had found her to be "a greedy daughter who was raiding the assets of her incapacitated father" based upon the transfer of substantial assets of the father to the daughter and her brother. *Id*. at 365-66. However, the appellate court determined that "[w]hile initial examination of these transfers could lead one to suspect improprieties, careful scrutiny reveals that the transfers were not nefarious and certainly not of a character to preclude [the daughter] from serving as her father's guardian." *Id*. at 366.

In addition to the record showing that bank accounts were transferred and the children began managing real property before the father became incapacitated, and that the transfers were undertaken to protect his assets from his live-in companion, the daughter maintained that the transfers were consistent with her father's wishes, and offered to introduce proof of those wishes. Specifically, the daughter sought to admit a videotape of her father taken five months before his stroke for a documentary about Holocaust survivors, in which he stated that he gave the property at issue to his children. "However, the court, impatient with the speed at which the hearing was proceeding, did not provide [the daughter] with an adequate opportunity to admit the tape into evidence." *Id*. The appellate court therefore directed the change of guardian to the daughter upon this rejected evidence that "would

- 16 -

have substantiated [the daughter's] testimony that, far from being motivated by a conflict of interest, her actions were consistent with her father's wishes for the management of his finances." *Id*.

Having thoroughly reviewed both the binding and persuasive authority applicable to the instant case, we turn to the claims of error argued by Ms. Wehar in this appeal. Boiled down to their essence, Ms. Wehar makes two contentions: (1) the record establishes that Mrs. Rodgers had a conflict of interest that disqualified her from being appointed by the orphans' court as Mr. Rodgers's limited guardian, and (2) the trial court abused its discretion by excluding additional evidence of Mrs. Rodgers's conflict. We do not find reversible error as to Ms. Wehar's first position, but agree that the second issue warrants remand for a new hearing.

Ms. Wehar's arguments that Mrs. Rodgers had a conflict of interest that disqualified her under § 5511(f) are based upon evidence that is not in the record. The facts that Ms. Wehar cites as proof of the conflict are that Mrs. Rodgers attempted to transfer $1 million from Mr. Rodgers to herself, alter a trust document to double the amount she would receive, sell property owned by Mr. Rodgers, and invalidate her prenuptial agreement. Ms. Wehar's brief at 6. However, in her statement of the case, Ms. Wehar acknowledges that the orphans' court did not permit her to introduce the instrument that would have modified the trust or to elicit testimony from the attorneys who drafted the document, and that it excluded evidence of the filing of a divorce

proceeding and claim for support, as well as Mrs. Rodgers's attempt to invalidate the prenuptial agreement. *Id*. at 10. Moreover, Ms. Wehar's remaining appellate arguments concern whether that evidence should have been admitted rather than excluded. *Id*. at 26-30. As such evidence was not admitted, we will not consider whether it established a conflict.

Hence, the only evidence of a conflict asserted by Ms. Wehar on appeal that was admitted is that Mrs. Rodgers's efforts to change Mr. Rodgers's estate plan to give $1 million to herself. On that topic, Ms. Wehar testified that Mr. Rodgers called her after suffering his second round of strokes and bleeding on the brain and informed her that he wished to give away his money. N.T. 5/2/18, at 22-23. Thereafter, Mrs. Rodgers informed Ms. Wehar that Mr. Rodgers desired to give Mrs. Rodgers $1 million and wanted Ms. Wehar to use her POA to sign for him. *Id*. at 24. Mrs. Rodgers acknowledged the request, but added that it involved not only giving her $1 million, but also $1 million to each of Mr. Rodgers's grandchildren (Ms. Wehar's children), and that Mr. Rodgers had expressed that he "should have done this a long time ago." *Id*. at 145-46.

We cannot conclude that the orphans' court abused its discretion in holding that this action by Mrs. Rodgers failed to rise to the level of a disqualifying conflict of interest. *See*, *e.g.*, *Heidtman's Estate*, *supra* at 880 (holding orphans' court did not abuse its discretion in concluding that notes of wife that suggested husband's prior mismanagement of wife's stocks

was insufficient to evidence a disqualifying conflict); *In re Chase*, *supra* at 366 (concluding prior transfer of assets by daughter to herself and her brother did not show a conflict where evidence indicated the transfers were desired by the father).

However, the orphans' court did abuse its discretion in refusing to allow Ms. Wehar to submit evidence that could establish the type of adverse financial interest that would disqualify Mrs. Rodgers from serving as a guardian for her husband. Our review of the transcript reveals that the orphans' court was "impatient with the speed at which the hearing was proceeding," *id*., and was determined to focus the evidence on the question of whether Mr. Rodgers was incapacitated at the time of the hearing, rather than aspects of the family relationships that might reveal a conflict. *See*, *e.g.*, N.T., 5/2/18, at 24 ("I have to keep this moving. I have other cases today."); *id*. at 38 ("This is a guardianship. It's not Family Court. It's not all this marital problem stuff. I want to get just the issues and the guardianship period. And that would be the judgment [of] whether or not he is incapacitated."); *id*. at 38-39 ("We're not getting into prenup's [sic]. I'm not doing that. What else do you have to ask about his incapacity as far as this witness is concerned[?] What can she add to the discussion regarding that[?] That's it."), *id*.at 39 ("At some point we [need] to take a break so I can do some of the other cases because the way this is going -- I don't do [the] all

day thing."); *id*. at 143-44 (prohibiting Ms. Wehar from even making an offer of proof regarding the relevancy of the prenuptial agreement).

As the case law discussed at length above demonstrates, the determination of a conflict of interest is properly informed by the relationship between the incapacitated person and the proposed guardian before the incapacity arose, by whether the proposed guardian stands to benefit later from her non-use of funds for the benefit of the ward during the guardianship, and by the actions taken by the proposed guardian after incapacity arose but before guardianship proceedings commenced.

Mrs. Rodgers's filing for divorce and seeking spousal support a few years prior to the guardianship proceeding could be relevant to her qualifications, especially where there is no indication how or if the litigation concluded. What stake Mrs. Rodgers has in Mr. Rodgers's assets pursuant to the prenuptial agreement, the trust, and the proposed amendment to the trust are relevant to whether Mrs. Rodgers might be better served conserving income to obtain herself later, rather than expending it for Mr. Rodgers's benefit now. This is especially true where Mrs. Rodgers testified that, under the estate plan currently in place, she would not have sufficient money. N.T., 5/2/18, at 145. If proven true, Mrs. Rodgers's alleged unilateral attempt to amend the trust by requesting that Mr. Rodgers's attorneys draft a new instrument during a time when Mr. Rodgers was incapacitated would certainly

be relevant to her qualification to serve as his guardian. **See Wilhelm**, **supra** at 39; **Bean**, **supra** at 173.

We also conclude that the orphans' court abused its discretion in quashing Ms. Wehar's subpoenas of Attorneys John Vuono and Louise Vuono and precluding Ms. Wehar from calling them as witnesses. Without a doubt, the attorneys, who acknowledged that they represent Mr. Rodgers regarding estate planning issues,[4] would not be competent to offer any testimony about "confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." **Gillard v. AIG Ins. Co.**, 15 A.3d 44, 59 (Pa. 2011). **See also** 42 Pa.C.S. § 5928. However, as counsel for the Vuonos also acknowledged, the privilege would not prevent them from testifying to facts such as the sending of a document. N.T., 5/2/18, at 54. Ms. Wehar represents that she sought to establish through the Vuonos that they did send the amended trust document to Ms. Wehar. Ms. Wehar's brief at 29.

Further, the Vuonos did not indicate that they represented Mrs. Rodgers, and Mrs. Rogers testified that she was the one who contacted the lawyer about altering the estate plan. **Id**. at 146. Moreover, Ms. Wehar was not given the opportunity to explore whether the privilege was inapplicable, such as the

---

[4] See Motion to Quash, 5/2/18, at ¶ 3.

- 21 -

situation where communications were made in the presence of third parties. *See*, *e.g.*, *Bean*, *supra* at 173.

Therefore, the orphans' court abused its discretion in assuming that the Vuonos had no relevant evidence that they could properly offer and precluding them from being called as witnesses. Rather, the appropriate course of action would have been for the court to allow the attorneys to have been called as witnesses and to assert the privilege as warranted by the questions asked.

As the record reveals that the orphans' court, in its haste to complete the proceedings and its concern solely for the issue of Mr. Rodgers's capacity, declined to consider properly-offered evidence relevant to the issue of Mrs. Rodgers's qualifications to serve as guardian for Mr. Rodgers, we remand for a new hearing on that issue alone. Should the orphans' court determine upon consideration of the relevant evidence that Mrs. Rodgers has no adverse financial interests to disqualify her from serving as the limited guardian of Mr. Rodgers, the court shall enter an order confirming the May 22, 2018 order. Otherwise, the court shall appoint a disinterested third party to serve as limited guardian of Mr. Rodgers's estate.

Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>4/22/2019</u>